IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO.: 2:18-CV-22 (WOB-CJS)

JASON RAGLAND                                              PLAINTIFF

VS.                  <u>MEMORANDUM OPINION AND ORDER</u>

BM2 FREIGHT SERVICES, INC.                                 DEFENDANT

This matter is before the Court on the motion for summary judgment by defendant BM2 Freight Services, Inc. ("BM2"). (Doc. 32).

The Court heard oral argument on this motion on Friday, August 23, 2019, and thereafter took the matter under submission. (Doc. 40).

After further study, the Court now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

Plaintiff Jason Ragland ("Ragland") served in the United States Marine Corps from 1999 to 2004, and from 2005 to 2008 he worked for the U.S. Department of State's Bureau of Diplomatic Security and served in combat duty in Iraq. (Doc. 26-4). From 2008 to approximately 2012, Ragland operated a military procurement business. (*Id.*; Ragland Depo. at 19-22).

When Ragland moved back to Cincinnati, Ohio, he told a friend who operated a freight business that he was interested in working in the freight logistics field. (Ragland Depo. at 18-19). Ragland, however, had no experience in that field, and his friend's company did not provide training, so the friend referred Ragland to BM2. (*Id.*) BM2 is a full-service brokerage company that operates throughout the United States and Canada, which was started in 2008. BM2 is owned by Kevin Ball, Matthew Mason, and Jeffrey Mason. (Ball Depo. at 7-8, 21).

Ragland provided BM2 with his resume that listed his military service and experience as a security contractor. (Ragland Depo. at 12-13). Ball testified that Ragland's military experience "got him in the door" and was one reason they hired Ragland because BM2 was hoping to secure Department of Defense and other government business. (Ball Depo. at 75, 203).

Ragland began at BM2 as an assistant to obtain on-the-job training, and he then progressed to an account executive. (Ragland Depo. 32-34). In 2014 or 2015, Ragland was promoted to senior account executive and he became one of BM2's top salespeople. (Ragland Depo. 45-47; Ball Dep. 61-62; M. Mason Dep. 6).

In January 2016, BM2 hired Scott Klever ("Klever"), who became Ragland's supervisor and BM2's Vice-President of Business Development. (M. Mason Dep. 6; Ball Dep. 53; Klever Depo. 5-6). After he was hired, Klever raised Ragland's pay and that of another

leading salesperson, Jess Meloche. (Ragland Depo. at 151). Around the same time, company management decided to have four team "leads" and chose Ragland as one of them. (M. Mason Dep. 6).

Ragland testified that he does not have PTSD as a result of his military service, and that he never told or hinted to anyone at BM2 that he had PTSD. (Ragland Depo. at 118). However, he testified that several co-workers at BM2 asked him if he had PTSD or had killed anyone. (Ragland Depo. 118-119, 121-). Ragland testified that he told them that such questions were "weird" or "awkward."

Klever once asked Ragland about his combat experience in Iraq while the two men were driving to Michigan for a business meeting. Ragland testified that he found this "awkward" and probably told Klever that he did not have PTSD. (Ragland Depo. 119-121). Ragland did not recall that Klever asked any further questions or that the subject ever came up again between them.

Ragland testified that Ball once asked him about his combat experience on a business trip to Washington, D.C., but he could not recall if Ball asked him if he had PTSD. (Ragland Depo. at 126-127). Neither Jeff Mason nor Matthew Mason ever asked Ragland if he had PTSD. (*Id.*).

On March 21, 2016, Ball sent Ragland an email asking him if he had put in a bid on a government account that BM2 had assigned to him. (Doc. 30-10). Ragland responded that he had not, and

3

Ball asked him why. An exchange followed in which Ragland implied that Ball did not understand government contracts; Ball explained that if Ragland was not going to try to develop the business, Ball could reassign it:

> I just want to make sure whoever has the account is spending the necessary time & effort to do what it takes to earn freight.
>
> If you want more time on the account, just let me know. But it does BM2 no good to have that account sit dormant while no one works on it. So if you are not going to do it, I need to give it to someone else who will.

(Doc. 30-10 at 2).

Ragland responded:

> Do you think I'm not doing it right? I spend months getting everything in order, finding the right people, building rate matrixes, and learning the different systems that the government uses.
>
> I feel like I'm getting accused of not doing my job because I didn't bid on one RFP in 3.5 years.
>
> I understand that you guys are frustrated with the market, but I have always done my job and I have done a great job at it as it has allowed BM2 to grow tremendously.
>
> Sorry, but I feel like I'm getting attacked.

(Doc. 30-10 at 1).

Ball responded:

> In no way are you getting attacked. You are taking this way too personally and getting defensive. Nothing in anything I wrote was personal in nature. I didn't question your ability, I didn't say anything about you in any way. I was asking about

4

> an account. That is very concerning that you would get so defensive about this.
>
> I don't know why you think I am not allowed to question you and how you do things. Whether you are a million dollar broker or just starting out, as your boss and the owner of this company, it is well within my boundaries to question how an account is being run. In fact the real problem would be if I *didn't* take a good hard look at every aspect of the business and see how it can improve. I do that with every aspect of the business. In this case I bring up an account that hasn't generated a dollar's worth of revenue in 3 years and it makes you upset? Why shouldn't I question it? You were handpicked for that account. Of course I am going to question where the failure lies with that account! You have obviously been very successful with the APL account, so that tells me you are a very capable broker. That makes it even more puzzling on why the government freight hasn't taken off.
>
> Bottom line is you do have to answer to me. Just the way it works. I leave you alone and largely let you do your thing because you are a profitable broker. But I have every right to question the status of an account that I personally put in your hands.

(*Id.*).

Ball testified that he did not like the fact that Ragland was ignoring an account that Ball had given him, and he also felt that Ragland's attitude when questioned by management was inappropriately defensive. (Ball Depo. 75-78

Around the same time, BM2 management decided that they had become lax about enforcing the 8:00 a.m. start time for employees and that it sent the wrong message. On March 29, 2016, Ball sent out an email stating that all employees were required to start

5

work strictly at 8:00 AM. (Ball Depo. 64-65; Doc. 30-8). Later that day, the Human Resources Manager followed up with an email to all employees which stated, in part:

> Good morning Team-
>
> As previously discussed in Kevin's email, as of tomorrow, 3/30/16, our 8:00 start time will be strongly enforced. We will be monitoring arrival times and issuing written warnings to anyone who is not here by 8:00.

(Doc. 30-11 at 3).

Ragland immediately emailed Matthew Mason and told him he felt this was a form of "micromanaging" and that because of his sales performance, he did not "want to be categorized with everyone else." (*Id.*; Ragland Dep. at 65-66, 76). The next day, Ball sent out a very stern email noting that the 8:00 start time policy had been "met with some discord" but that it was "non-negotiable" regardless of any employee's "numbers" or "position." (Doc. 30-9).

Ragland also had a dispute with management about one of his potential "tagged" sales prospects that management gave to another broker because they believed that Ragland was not doing enough to solicit the prospect's business. (M. Mason Dep. 10-13; Ball Dep. 40-41). Matthew Mason testified that Ragland questioned Mason's integrity while discussing the incident, and that the discussion became so heated that Mason called Ball into the room to defuse the situation. (M. Mason Dep. 16-18). Ragland testified that such

6

"an incident" like that "could have happened," but he denies that he questioned Mason's ethics or that Ball was called into the room. (Ragland Depo. at 78-84).

In May, after terminating an account executive named Tyler Reed, BM2 had to reassign his accounts. Ragland testified that Klever and Matthew Mason met with the account executives and told them that Reed's accounts would be divided among the four team leaders and then to the rest of the company. (Ragland Depo. at 86-87). Ragland testified, however, that BM2 was not obligated to assign the accounts to him or any other team leader. (Ragland Depo. at 87).

On May 16, 2016, Klever began reassigning Reed's accounts to other executives. Ragland testified that he saw Klever assigning accounts to others "all day" and that, by 5:00 p.m. when Klever had not yet assigned him any of the accounts, Ragland texted him to see what customers he would be getting. (Ragland Depo. 87-88). By that time, Ragland had printed out a list of Reed's accounts.

When Ragland found Klever, he asked him which of Reed's accounts he would be getting. Klever and Ragland went into Ball's office, which was empty, and Klever explained to Ragland which accounts he was being assigned. (Ragland Depo. at 88-90). Unhappy with this information, Ragland took the piece of paper showing Reed's accounts, crumbled it, threw it into a trash can and stated, "I don't know why I keep getting treated like shit." (Ragland Dep.

89-91; Meloche Dep. 39-40). He then left Ball's office, went back to his desk to get his keys and wallet, and then left. (Ragland Depo. at 94).

The next morning, Klever told Matthew Mason about the incident and that he felt that Ragland had been very disrespectful to Klever as his supervisor. (M. Mason Depo. at 24; (Meloche Dep. 42). Klever then went to speak to Ragland. Klever told Ragland to "look me in the eye like a man," and reprimanded him. (Ragland Dep. 100-101; Klever Dep. 14-15; Meloche Dep. 43-44). Ragland then went into Matthew Mason's office and told Mason that he was going to work from home because "I can't work for somebody that's going to talk to me that way." (Ragland Depo. at 105; M. Mason Dep. 21). Mason testified that he did not ask Ragland what had happened because he did not want to deal with more "drama" and "negativity." (*Id.*).

On his way home, Ragland — who testified that "his adrenaline was going" — called Jeff Mason, who was on his way to work, and told him what happened. (Ragland Depo. at 109-110) Jeff Mason testified that Ragland told him that Matthew Mason and Klever "didn't know what they were doing." (J. Mason Dep. 9-10).

When Jeff Mason arrived at the office, he, Ball, and Matthew Mason convened. They discussed what they believed was a pattern of negative behavior by Ragland. (J. Mason Dep. 10-15; Ball Dep. 72-73). Matthew Mason testified:

8

> We talked about the – terminating him. You know, this was another -- another incident, another – another dramatic negative thing towards our culture, and it was kind of like the straw that broke the camel's back. We're like, you know, "Enough is enough. We can't keep doing the same stuff," you know, and we decided to terminate him.
>
> . . .
>
> Well, we had talked about it, you know, a lot that morning, but we had hired some consultants previously when we were – we were talking about the culture of the company and how negative employees can vastly impact the culture of the company negatively. And we had had conversations about Jason in our weekly meetings that I referenced earlier, about his negativity and his incidents and how it was not a good thing for our company's culture.

(M. Mason Dep. 22, 26).

Similarly, Ball testified:

> After that, we had a conversation on how to — what needed to happen. Again, you know, as before, Mr. Ragland wasn't terminated for one thing. I think that last incident was proverbially the straw that broke the camel's back, and — and, you know, this employee is — and the way they operate and how they treated superiors as well as co-workers and the method in which they express displeasure was running counter to the culture of the organization that we were trying to foster and build.
>
> . . .
>
> And the environment had gotten too toxic. Jason's malcontentment, I guess, if that's a word, just — you know, his level of discontent with the office, the owners, how we were doing things and his displeasure was running counter to, again, what we were trying to — to do.

(Ball Depo. at 87-89).

9

Management decided to terminate Ragland's employment. Ball had tried to reach Ragland via text, and Ragland called him back. Ball told Ragland he was being terminated. (M. Mason Dep. 22-27; Ball Depo. at 97-99; Ragland Depo. 111-113). Ragland was not allowed to return to collect his effects in person, but BM2 mailed them to him.

Ragland filed suit in this Court on February 12, 2018, (Doc. 1), alleging two claims: (1) Veteran Discrimination pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4311, and (2) Disability Discrimination pursuant to the Americans with Disabilities Act of 1990, as amended, ("ADA"), 42 U.S.C. § 12101, and KRS Chapter 344.

*Analysis*

**A. Veteran Discrimination**

"USERRA was enacted to prohibit discrimination against individuals because of their military service." *Bobo v. United Parcel Serv.*, 665 F.3d 741, 754 (6th Cir. 2012). The statute prohibits employers from, as relevant here, terminating an individual's employment on the basis of their military status. 38 U.S.C. § 4311(a).

The USERRA discrimination analysis is a two-step process. *Hickle v. Am. Multi-Cinema, Inc.*, 927 F.3d 945, 952 (6th Cir. 2019) (citation omitted). "The plaintiff must first make out a prima facie case of discrimination by showing, by a preponderance of the

10

evidence, that his protected status was a substantial or motivating factor in the adverse employment action." *Id.* (citation and internal quotation marks omitted).

"Discriminatory motivation may be inferred from a variety of considerations, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the employer's conduct and the proffered reason for its actions, the employer's expressed hostility toward military members together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Bobo*, 665 F.3d at 754.

If the plaintiff establishes a prima facie case of discrimination, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Hickle*, 927 F.3d at 952 (citation omitted).

In support of his USERRA claims, Ragland argues that Meloche, a non-veteran, was similarly situated to him, engaged in similar behavior towards management, and yet was not terminated. (Doc. 35 at 9-17). He also relies on his assertion that he was perceived to have PTSD. (Ragland Depo. at 141).

The Court has reviewed the record carefully and concludes that the record simply does not contain evidence from which a

reasonable jury could conclude that Ragland's military service was a "substantial or motivating factor in the adverse employment action." *Hickle*, 927 F.3d at 952 (citation omitted).

First, there is no proximate connection between Ragland's military activity and his termination. Ragland's military service ended in 2008, four years before BM2 hired him and eight years before it terminated his employment. BM2 not only knew of Ragland's service at the time it hired him, but the undisputed evidence is that the company considered it a positive factor. Ball testified that it "got Ragland in the door," and that his military service was particularly attractive because they were hoping to secure government contracts and felt that Ragland's background gave him vital experience in that area.

Second, the same management team that hired Ragland made the decision to end his employment. While this factor is not dispositive, common sense dictates that it undermines any suggestion of discriminatory animus. As Ball testified:

> I think it would be pretty silly to hire somebody because they're a veteran and then fire them because they're a veteran. The veteran status is what got him in the door. We've hired several veterans over the years. I have great respect for — for veterans and — and their work ethic. It had nothing — you know, Jason being a veteran is the one thing I really admire about him. We let him go because it wasn't a cultural fit.

(Ball Depo. at 203).

With respect to Jess Meloche, the sole alleged comparator, Ragland argues that Meloche engaged in "shouting matches" with BM2 management, once stormed out of a contentious meeting, and commented to Matthew Mason that he was being "screwed" by a new compensation structure. Thus, Ragland argues, this is evidence of disparate treatment that satisfies the *prima facie* case.

Ragland bears the burden of showing that Meloche's conduct was comparable to his own. *Escher v. BWXT-12,* LLC, 627 F.3d 1020, 1029 (6th Cir. 2010) (citation omitted). The Sixth Circuit recently addressed the analysis of whether two employees engaged in acts of "comparable seriousness" for purposes of the "similarly situated" analysis in a disparate treatment claim. *See Johnson v. Ohio Dep't of Public Safety*, — F.3d —, No. 18-4181, 2019 WL 5938095, at *3 (6th Cir. Nov. 13, 2019). The Court explained:

> When it comes to comparable seriousness, it is the particular conduct of the [employees], not broad generalizations, that counts. **Drawn at too high a level of generality, the "comparable seriousness" test becomes meaningless**. True, stitches and open-heart surgery are both medical procedures. But that does not mean they are of "comparable seriousness."

*Id.* (emphasis added).

At a high level of generality, Meloche's conduct might seem similar to Ragland's. However, the testimony from BM2 management is consistent — despite Ragland's assertion to the contrary — that the company was trying to generate a positive culture and that

13

Ragland displayed a pattern of negativity that ran counter to that effort. Ball testified that Meloche differed in this respect:

> Q. All right. Has Mr. Meloche ever raised his voice in closed-door meetings with you or the [] Masons?
>
> A. Raised voice, maybe. Not – not a specific incident. I mean he can be animated, but, again, Mr. Meloche is also a culture champion for us and – and he also – you know, he can disagree with things and – keep it professional and still – still provide a beacon of leadership and culture, and that's why he's still there.

(Ball Depo. at 131-132).

Ragland's reliance on the questions about his service and whether he had PTSD is also unavailing. First, as noted above, most of these questions were from co-workers who had no role in management's decision to terminate Ragland's employment. Similarly, Ragland had only a single conversation with both Ball and Klever, and neither of the Masons ever discussed Ragland's service with him or asked any service-related questions. And Ragland cites no evidence that connects any question about his service to the termination decision.

This record thus stands in stark contrast to cases where decisionmakers express anti-military animus or distaste for an employee's service history or obligations. *See, e.g., Hickle v. Am. Multi-Cinema, Inc.*, 927 F.3d 945, 952-954 (6th Cir. 2019);

14

*Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 755-56 (6th Cir. 2012).

In sum, the record is devoid of any evidence that BM2 management harbored any anti-military animus towards Ragland. Ragland thus has not shown that his veteran status was a factor, much less a substantial or motivating factor, in BM2's decision to terminate his employment. The Court will thus grant BM2's motion for summary judgment on this claim.

### B. **Disability Discrimination**[1]

Title I of the ADA prohibits covered employers from discharging an employee because the employee is disabled, because the employee has a record of being disabled, or because the employer regards the employee as disabled. *Babb v. Maryville Anesthesiologists P.C.*, — F.3d —, No. 19-5148, 2019 WL 5778336, at *7 (6th Cir. Nov. 6, 2019) (citing 42 U.S.C. §§ 12102(1), 12112(a)).

Ragland's disability discrimination claim is premised on the theory that BM2 "regarded" him as suffering from PTSD and that it terminated him on that basis.

A plaintiff may make out a "regarded as" ADA claim by establishing that he was discharged because of "an actual or perceived physical or mental impairment whether or not the

---

[1] The parties agree that the analysis of Ragland's claims under the ADA and the KCRA are the same. (Doc. 35 at 17 n.8.).

impairment limits or is perceived to limit a major life activity." *Id.* at *7-8 (quoting 42 U.S.C. § 12102(3)(A)). The plaintiff bears the burden of proving that the perceived disability was a "but-for" cause of his termination. *Id.* at *8.

Ragland, devoting only two pages of his response brief to his ADA claim, relies primarily on the fact that some employees asked him if he had PTSD and that BM2 informed him of the termination over the phone and did not allow him to return to the office to collect his belongings.

Again, the Court has reviewed the record carefully and finds that it contains no evidence from which a reasonable jury could find in Ragland's favor on this claim.

Ragland testified that he does not have PTSD, and when asked about it by co-workers he made that clear. (Ragland Depo. at 8, 123). He offers no evidence that, after these arguably inappropriately personal inquiries, any BM2 employee acted in such a way that would suggest they regarded Ragland as suffering from PTSD. And other than a single conversation with Ball and Klever, these questions came from co-workers who were not involved in any way with Ragland's termination. And neither Jeff Mason nor Matthew Mason ever asked Ragland about PTSD. (Ragland Depo. at 12, 126-27).).

Further, Ragland cites no evidence that either Klever or Ball thought Ragland had PTSD. In fact, Ball testified that he never

16

heard anyone at BM2 suggest that Ragland had PTSD.  (Ball Depo. at 125).  And Ball testified that he informed Ragland of his termination when he did simply because they were already on the phone.  (Ball Depo. at 122).

In sum, Ragland's theory of his ADA claim presumes a combat-veteran stereotype where the record contains no evidence that any of the decisionmakers in question subscribed to such a view.

Therefore, having heard the parties, and the Court being advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 32) be, and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 22nd day of November 2019.



**Signed By:**
*William O. Bertelsman*
**United States District Judge**